752 A.2d 646

**In re ADOPTION/GUARDIANSHIP NO. T96318005 in the Circuit Court for Baltimore City.**

**No. 662, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 1, 2000.

300

Victoria Lansburgh, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee, DSS.

Ellen Hyers, Catonsville, on the brief, for Edwin C. (child).

Submitted before MOYLAN, WENNER and THIEME, JJ.

MOYLAN, Judge.

The appellant, Janet P., challenges an order issued by Judge Martin P. Welch, Sr., in the Circuit Court for Baltimore City terminating her parental rights with regard to her son, Edwin C. On appeal, she contends:

1. that the trial court erred in terminating her parental rights; and

2. that the trial court erred in admitting hearsay evidence.

On August 17, 1994, the appellant's son, Edwin C., was declared to be a child in need of assistance ("CINA") and committed to the Baltimore City Department of Social Ser-

vices (the "Department"), with limited guardianship awarded to the appellant's aunt, Leola J. Edwin's status as a CINA was continued at a review hearing on February 28, 1996.

According to stipulations entered into by both the appellant and the Department, the appellant has been "diagnosed as having a rare, severe psychiatric disorder called 'Munchausen Syndrome by Proxy.'" The disorder "is characterized by a parent's, usually a mother's, falsely reporting or actually causing symptoms of medical illness in her child." As a result of this disorder, the appellant's first child, Christina, was declared to be a CINA in June of 1990, when she was eleven months old, after it was determined that she needed to have 95% of her pancreas removed due to severe life-threatening hypoglycemia. The hypoglycemia was caused by the appellant's having injected Christina with insulin.

The appellant's parental rights with regard to Christina were terminated and Christina was subsequently adopted. The appellant was ultimately convicted of child abuse and sentenced to fifteen years imprisonment. The appellant's sentence was suspended and she was placed on five years probation. As of February 28, 1996, the appellant's probationary period had ended.

On November 11, 1996, Department filed a petition to terminate the appellant's parental rights with regard to Edwin. On March 4 and June 7, 1999, a two-day hearing was held in the Circuit Court for Baltimore City. Judge Welch found that termination of the appellant's parental rights would be in Edwin's best interest and granted the Department's petition. The appellant noted this timely appeal.

The appellant first contends that Judge Welch erred in terminating her parental rights. The appellant specifically contends that the trial judge erred in finding that the appellant's previous abuse of Christina was enough to outweigh the Department's requirement to offer adequate reunification efforts as provided for in Md.Code, Family Law, § 5–313(c). We are not persuaded.

Section 5–313 of the Family Law Article provides, in pertinent part:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration of the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interests;

(iv) the child's adjustment to home, school and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months form the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as inducement for the natural; parent's rehabilitation; and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

In cases involving a child previously adjudicated as a child in need of assistance, the section further provides:

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically able and financially able;

(iv) 1. the child was born:

A. addicted to or dependent on cocaine, heroin, or a derivative thereof; or

B. with a significant presence of cocaine, heroin or a derivative thereof in the child's blood as evidenced by toxicology or other appropriate tests; and

2. the natural parent refuses admission into a drug treatment program or failed to fully participate in a drug treatment program; or

(v) the natural parent has:

1. subjected the child to:

A. torture, chronic abuse, or sexual abuse; or

B. chronic and life-threatening neglect;

2. been convicted:

A. in this state of a crime of violence, as defined in Article 27, § 643B of the Code, against the child, the other natural parent of the child, another child of the natural parent, or any person who resides in the household of the natural parent;

B. in any state or in any court of the United States of a crime that would be a crime of violence, as defined in Article 27, § 643B of the Code, if committed in this State against the child, the other natural parent of the child, another child of the natural parent, or any person who resides in the household of the natural parent; or

C. of aiding, abetting, conspiring or soliciting to commit a crime described in item A or item B of this item; or

3. involuntarily lost parental rights of a sibling of the child.

(2) If a natural parent does not provide specific medical treatment for a child because the natural parent is legitimately practicing religious beliefs, that reason alone does not make the natural parent a negligent parent.

(3) The court shall consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing

evidence that the waiver of those obligations is in the best interest of the child.

(4) The Court shall waive the child placement agency's obligations under subsection (c) of this section if the court finds that one of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists.

(5) If the court finds that any of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists, the court shall make a specific finding based on facts in the record, as to whether or not the return of the child to the custody of the natural parent poses an unacceptable risk to the future of the safety of the child.

In rendering his decision and thereby terminating the appellant's parental rights, Judge Welch considered extensively all of the required considerations listed in § 5–313 and explained his findings as follows:

The Court, having had the opportunity to review the exhibits, the three exhibits, that were admitted into evidence as well as the testimony that was given in this court on March 4, 1999, and today's date, the court makes the following findings pursuant to Family Law Article 5–300, generally. First of all, the Court makes a finding that the respondent's father, Mr. Edwin Andrew C., filed a notice of objection on November 1, 1996, and then on October 16, 1997, filed with the court a fully signed denial of paternity and consent to guardianship. So, therefore, he is deemed to have consented by operation of law.

The Court's following findings and comments will address issues as to both the respondent, Edwin C., and the respondent's mother, Ms. Janet P. First of all, the Court finds pursuant to Family Law Article 5–313(a)(2) that this respondent, on August 14, 1994, was found to be a child in need of the Court's assistance and committed to the Department of Social Services, and has remained committed to the Department ever since. The Court will consider though, the 5–313(c) factors, and specifically, (c)(1), to wit, primary consideration to the safety and health of the respondent.

The Court does find that the Department of Social Services, through the current caretaker, is meeting the safety and health needs of the respondent. The Court is not at this juncture fully satisfied or convinced of the mother's ability. I am not saying that she cannot, but the mother has not had an opportunity to demonstrate if she is able to meet his safety and health needs. The (c)(2) factors are considerations to (2)(i), timeliness, nature, and extent of services offered by the child placement agency to facilitate reunion of the child with the natural parent.

The Court finds that—and maybe it is the nature of this case, the respondent was born in June 1994, and then finally . . . 8 months later, the Department gets the treatment plan from Dr. Ravenscroft. So the Court is not overly convinced that the Department provided services in the timeliest of fashions. The Court does find, at least as to this one issue, that one of the underlying issues in this case had to do with conflict or family issues and conflict resolution between the caretaker and the other maternal relatives as well as the mother. The Court finds that the Department did not exactly make the most effective referrals to the mother to deal with issues of conflict resolution.

The (c)(2)(ii) factor, any social service agreements, in this case there were not social service agreements entered into between the mother and the Department. Section (2)(iii) is the child's feelings toward and emotional ties with parents, siblings, or other individuals who may significantly affect their best interests. Clearly, in this case, the Court finds that the respondent has a very strong parental bond with the maternal great aunt in this case, Ms. J., having been placed with her since he was 2 months old.

The Court does note that the mother does have contact with the respondent, does have a bond with the respondent, but it is not the same bond or it is not a parental bond as the respondent has with his maternal great aunt. The (c)(2)(iv), child's adjustment to home, school, and community, the Court finds that the respondent has adjusted quite well in his home, school and community; that he is receiving

services as to speech therapy; dental and health issues are being addressed; and participates in summer camps.

The (c)(2)(v) factor, the result of efforts that the mother may have made to adjust her conduct, circumstances, and conditions to make it in the respondent's best interest to be reunited, and (vi) is the extent to which the mother has maintained regular contact with the respondent. The Court does find that the mother has been visiting with the respondent on a regular basis, certainly a lot more frequently in 1996 and 1997, last saw the respondent in May, or just last month. But those visits obviously are problematic because of the family issues associated with it. But the Court does find that the mother has maintained regular contact with the respondent.

Section (vii) is if the natural parent is financially able to make any ... payment of a reasonable part of the child's substitute physical care and maintenance. The Court does find that the mother, by her own testimony and others, has purchased the respondent clothes and given the respondent gifts, and even bought the respondent a car seat. Section (v)(3) is the maintenance of regular communication with the parent or custodian of the child. I think the Court can clearly conclude that the mother, in spite of the family dynamic, has maintained contact with the de facto caretaker, who is Ms. J., and has maintained contact with the Department, albeit their communications and relationships are not the best. But the mother has maintained contacts with the Department of Social Services and respondent's legal custodian.

Section (v)(4) is whether any additional services will likely bring about a lasting parental adjustment so the child could be returned to the parent within an ascertainable period of time not exceeding 18 months from the time of placement. By the Court's calculation, this would have been in February of 1996. Because of the length of time, as well as some other—the issue of whether the mother has—whether this is a disability or not, the Court is not satisfied that any

additional services would bring about a lasting parental change.

Finally, under (c)(2)(vi), the Court will consider all services offered to the mother before placement of the child. The Court can only find, I think, those services that she may have received while on probation, as well as—I am not sure whether this kicks in—but the fact that the mother is receiving SSI benefits. The Court must also, though, consider the 5–313(d) factors in determining whether any of the following continuing or serious conditions or acts exist.

Section (d)(1)(i), the natural parent has a disability. Well, the Court, first of all, does find that the mother has a disability in the context in which the Court is able to read and try to understand, and has attended at least one training session on this syndrome. The Court is convinced that the mother has Munchausen syndrome by proxy. There is at least as part of an exhibit on page 60, Dr. Ravenscroft concluded that the mother was receiving her— or part of the reason why the mother receives SSI is because of this diagnosis. Now the other piece of this, though, is that the mother has a disability that renders the mother consistently unable to care for the immediate and ongoing psychological needs of the child for long periods of time. The Court—is still torn, and so even though the Court finds there is a disability, the Court is not satisfied that the disability would consistently make the mother unable to care for the respondent.

*However, we then get to (d)(1)(ii). It says that the natural parent has committed acts of abuse and neglect towards any child in the family. The Court finds that the mother did commit acts of abuse and neglect against the respondent's older sibling, Christina C., and as a result of that abuse and neglect, and as a result of the disability that is offered as the explanation, and the mother's conviction for that, the Court finds that the mother has clearly committed an act of abuse or neglect—a serious act of abuse of a member of the family, of a child in the family.*

Section (d)(1)(iii), there is no evidence here that mother repeatedly failed to give this respondent adequate food, clothing, and shelter since, by everyone's testimony, respondent was never in her care. Under (d)(1)(iv), that is not applicable in this case, there is no evidence here that the respondent was born drug-addicted. Plus, he was born too early for that statute to be applied. Under (d)(1)(v), there is no evidence here that the mother subjected this respondent to torture, chronic abuse, sexual abuse, chronic or life-threatening neglect, nor been convicted of an Article 27, § 643B type crime for any child in the family.

Now the Court notes the sentence in this case was 15 years, [with 14 years of that sentence suspended]. That is all the Court has before it. I cannot conjecture as to whether this was an Article 27, § 643B type crime. The Court, at this point, finds that it was not. Nor has the mother been convicted of the crimes set forth in (v)(2)(B) or (C). Under (d)(1)(v)(3) there is no evidence here that the mother involuntarily lost her parental rights of another sibling. Under (d)(2), there is nor evidence here suggesting the mother withheld any medical treatment because of her religious beliefs.

Section (d)(3), though, says the Court *may consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.*

*The Court, after having considered and given appropriate evaluation to the efforts made by the Department—they were far from perfect—but the Court is convinced that because of the specific finding I am making under (d)(1)(ii), and that is the acts of abuse and neglect of a child in the family, and not (d)(1)(i), which was disability, alleged disability, the Court does find by clear and convinc-*

*ing evidence that it is in the respondent's best interest to waive the Department's obligations under (c).*

*... The Court, having said all that, though—and this is a rather difficult and tragic case—the Court does find by clear and convincing evidence that it is in Edwin C.'s best interests to grant the Department's petition.* The Court, therefore will issue an order granting to the Department of Social Services with the right to consent to adoption or long-term care short of adoption, thereby terminating the natural rights of Janet P. and Edwin Andrew C.

In making his decision to terminate the appellant's parental rights, Judge Welch was clearly exercising the discretion afforded to him under § 5–313(d)(3). Section 5–313(d)(3) specifically provides:

*The court shall consider* the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts *and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.*

That is precisely what the trial judge did in this case.

He carefully examined all of the required considerations set forth in § 5–313 and in doing so found 1) that the appellant suffered from Munchausen syndrome by proxy, and 2) that the appellant had seriously abused another family member, Christina. Judge Welch then determined, based solely on the previous abuse, that it was in the best interest of the Edwin C. to terminate the appellant's parental rights. He specifically stated:

After having considered and given appropriate evaluation to the efforts made by the Department—they were far from perfect—but the Court is convinced that *because of the specific finding I am making under (d)(1)(ii), and that is the acts of abuse and neglect of a child in the family, and not (d)(1)(i), which was disability, alleged disability,* the

Court does find by clear and convincing evidence that it is in the respondent's best interest to waive the Department's obligations under (c).

Such a determination was clearly within the discretion of the trial court.

■ Section 5–313(d)(3) requires a court to consider "evidence regarding continuing or serious conditions or acts," and then gives a trial court the discretion to "waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child." Section 5–313(d) gives the trial court this discretion regardless if one or all of the "serious conditions or acts" listed in subsection (d)(1) exist. As such, the amount of weight a trial court places on any one of the "serious conditions or acts" is entirely within its discretion.

■ It is clear from Judge Welch's opinion that he carefully considered all of the evidence presented, as well as the required considerations set forth in § 5–313. In doing so, the trial court, although acknowledging that this case was "rather difficult and tragic", found by clear and convincing evidence that it is in Edwin C.'s best interests to grant the Department's petition. We see absolutely no abuse of discretion in that decision.

The appellant next contends that Judge Welch erred in admitting certain documents contained in the Department of Social Services 412–page record regarding the appellant because the documents contained inadmissible hearsay and were highly prejudicial. We see no merit in the contention.

■ Even assuming, for the sake of argument, that the three documents complained of by the appellant did contain inadmissible hearsay, any error on the part of the trial judge in admitting such evidence was harmless. Even excluding the documents complained of by the appellant, the trial judge was presented with ample evidence of the serious abuse on the

part of the appellant of her first child, Christina. As previously noted, the trial judge based his decision to terminate the appellant's parental rights with regard to Edwin on that fact alone. As such, any error in admitting the documents at issue, all of which contained reports concerning the appellant's motivation for the abuse, cannot be deemed to have been prejudicial. The actual abuse of Christina, not the appellant's motivation for committing the abuse, was what Judge Welch focused on in rendering his decision.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*