758 A.2d 552

**In re ADOPTION/GUARDIANSHIP NO. T98314013
in the Circuit Court for Baltimore City.**

**No. 2321, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Aug. 30, 2000.

402

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Ronna Lazarus, Baltimore, concurs with brief of other appellees.

Submitted before HOLLANDER, KENNEY and ROBERT L. KARWACKI (Retired, Specially assigned), JJ.

HOLLANDER, Judge.

The Baltimore City Department of Social Services (the "Department"), appellee, filed a petition for guardianship with the right to consent to adoption or long-term care short of adoption (the "petition"), seeking to terminate the parental rights of Donna W., appellant, as to her daughter, Jimetra D.[1] After a hearing on October 26, 1999, at which the parties proceeded by way of proffer, the Circuit Court for Baltimore

---

1. By letter to the Clerk of Court, counsel for Jimetra has advised that she "concur'[s]" with the Department's position.

City granted the petition. Appellant timely noted her appeal and poses one question for our consideration, which we have rephrased slightly:

Was the evidence legally sufficient to terminate the parental rights of the natural mother? [2]

For the reasons that follow, we shall affirm.

## FACTUAL BACKGROUND

Jimetra was born in Baltimore on May 26, 1994, to appellant and Jimmy D. Jimetra's father is not a party to this appeal, however. Appellant also has an older daughter, India. The record does not disclose India's date of birth or age, or whether Jimmy D. is her father.

Several months before Jimetra's second birthday, on February 27, 1996, appellant's mother (the "Grandmother")[3] went to appellant's residence to visit and discovered that appellant had left Jimetra alone in the residence. Because the Grandmother heard Jimetra crying but could not gain access into the home, she contacted a Baltimore City police officer, who made a forced entry. The incident of suspected neglect was reported to the Department, and Jimetra was immediately placed in the care of her Grandmother, who had apparently cared for Jimetra previously, when appellant was incarcerated.[4] Moreover, in 1991, appellant had voluntarily placed India in the care of the Grandmother.

---

**2.** In support of her argument as to insufficiency, appellant argues that the court erred in admitting "the entirety of the DSS 'business record'...." Accordingly, the Department has included a second issue in its brief, as follows:

When the Department's case record was offered into evidence as a business record, did opposing counsel's failure to identify and object to specific portions of the record containing inadmissible hearsay constitute a failure to properly preserve the issue for appellate review?

**3.** Appellant's mother is not identified by name in the record.

**4.** Although appellant was incarcerated for six months, the offense is not identified in the record.

On February 28, 1996, the Department filed a petition in the circuit court alleging that Jimetra was a "child in need of assistance" ("CINA"), pursuant to Md.Code (1974, 1998 Rep. Vol., 1999 Supp.), § 3–801(e) of the Courts & Judicial Proceedings Article ("C.J.").[5] Thereafter, the circuit court issued a shelter care order and the Department placed Jimetra in her Grandmother's care.

An uncontested adjudicatory hearing was held on March 27, 1996, at which appellant, who was present and represented by counsel, entered into a stipulation with the Department. Although that stipulation is not included in the record, counsel for the Department addressed the terms of that stipulation at the October 1999 termination hearing, stating:

[T]hat the mother was in a—was currently in a drug treatment program, that she had been attending since June of 1995, and that she was in that program four days a week to address substance abuse issues, and that at that time Mother indicated that she had been drug-free for 18 months.

The stipulation also indicated that the daycare—the drug treatment program prohibited the Mother from bringing her children to the drug treatment program with her and that on the occasion of February 27th, 1995, Mother did not have anyone to care for ... Jimetra. . . .

The stipulation further indicates, Your Honor, that the Mother was currently on parole and that she was being closely supervised by her parole officer and that the, the Mother had been attending drug treatment regularly and undergoing random drug tests and that all those tests had

---

5. C.J. § 3–801(e) provides:

"Child in need of assistance" is a child who requires the assistance of the court because:

(1) The child is mentally handicapped or is not receiving ordinary proper care and attention, and

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason that the child is being furnished nonmedical remedial care and treatment recognized by State law.

been negative for illicit substances, that the father of the child did not participate in the child's care and that his whereabouts remained unknown, and that the [Grandmother] was willing to continue to care for this child while the Mother continued her drug treatment and worked toward reunification.

... [T]he stipulation ... indicated that the Mother was to have liberal visitation with the child, as arranged by [the Grandmother] and herself; that the Mother was to cooperate with the Department; and that the Department agreed to refer the Mother for parenting classes; and that the Mother agreed to continue in substance abuse treatment, including urinalysis and recommended aftercare services.

Following the hearing in March 1996, the Department evidently had difficulty in arranging meetings with appellant. Appellant also failed to provide the Department with confirmation of her continued participation in a drug treatment program. Moreover, between the adjudicatory hearing on March 27, 1996, and the disposition hearing on May 22, 1996, Donna W. only visited Jimetra on one occasion.

A disposition hearing was held on May 23, 1996, at which appellant appeared with counsel. Again, the parties proceeded by stipulation, agreeing that Jimetra was a child in need of assistance and to commitment to the Department for continued relative placement. At the October 1999 termination hearing, the Department's attorney reviewed the stipulation from the disposition hearing, stating:

[T]he Department had attempted to meet with the Mother to discuss plans for reunification but had been unable to do so; ... the Mother had had one visit with [Jimetra] since the March 26th, 1996, hearing; and ... the Department had received no information from the Mother as to her continued participation in drug treatment or her random urinalysis testing.

At that time, the child had no special needs, and the parties agreed to a finding of CINA and commitment to the Department ... for relative placement and that further

disposition orders were that the Mother was to participate in substance abuse treatment, including random urinalysis and recommended aftercare. Mother was to maintain regular visitation with the child as arranged by the caretaker. Mother was to complete parenting classes and cooperate with the Department; that the Mother was to maintain regular contact with the Department and enter into a Service agreement with the Department and Mother was to provide the Court and the Department with documentation of her participation in [a] drug treatment program and release the results of her random urinalysis to the Department. . . .

Subsequently, the Department drafted several service agreements. Nevertheless, appellant never agreed to the terms of a service agreement. Moreover, the Department claimed that appellant's visits with Jimetra after May 1996 were "somewhat sporadic," interrupted in part by an additional period of incarceration for a violation of probation. Additionally, appellant did not provide the Department with documentation concerning: (1) participation in a drug treatment program; (2) participation in a parenting class; or (3) the results of random urinalysis tests.

Jimetra did very well in her Grandmother's home.[6] Both Jimetra and India were in their Grandmother's care until January 1999, when the Grandmother unexpectedly died from a stroke. Thereafter, both girls were placed with Sherine G., a maternal relative. At that time, appellant had not yet secured full-time employment, and she had only lived in her home for about a month. According to the Department's proffer at the termination hearing, Jimetra "made an appropriate adjustment to the maternal aunt's home." Appellant did not visit Jimetra in Sherine's home, however, because of

---

6. The Department discussed a plan of adoption with the Grandmother in September 1997. Although a signed consent to adoption was obtained from appellant, the Department declined to submit it to the court, because it was not obtained by an agent of the Department. Rather, it was procured through the efforts of the Grandmother.

"conflict" and "tension between the Mother and the caretaker."

On December 14, 1998, the Department filed its petition to terminate appellant's parental rights,[7] to which appellant timely objected. Because the Department was unable to locate Jimmy D., the Department successfully moved to waive notice to Jimmy D., pursuant to Md.Code (1999, 1999 Supp.), § 5–322 of the Family Law Article ("F.L.").[8] Accordingly, the father was deemed to have consented to the petition.

As noted, the parties proceeded by proffer at the termination hearing on October 26, 1999. Although appellant did not attend that hearing, she was represented by counsel. A footnote in appellant's brief explains that appellant was "detained" at the time and was therefore unable to attend. No other information has been provided as to how or why appellant was detained.

Most of the facts set forth above were derived from the proffer made by the Department's counsel at the termination hearing. At the close of the proffer by the Department's attorney, Linda Davis, the supervisor of the worker assigned to Jimetra's case, verified the accuracy of the proffer. Counsel for Jimetra and counsel for appellant declined the opportunity to cross-examine Davis.

The Department also offered its record into evidence as an exhibit. Although Jimetra's counsel did not object, the mother's attorney noted a "standing objection to the Department's record," stating: "I do not believe it's a business record and some of the items that are contained therein are not kept in

---

7. The record contains a date-stamped copy of the Petition. We note, however, that in its brief the Department indicates that the Petition was filed on November 10, 1998. Moreover, the docket entries in the Record Extract indicate "TRR Requested" on November 10, 1998.

8. F.L. § 5–322(c)(1) provides: "Except in an independent adoption, if the court is satisfied by affidavit or testimony that the petitioner, after reasonable efforts in good faith, cannot learn the identity or location of a natural parent, the court may waive the requirement of notice to the natural parent."

the ordinary course of business. They are not items that the social worker herself would have prepared." The court said it "will sustain in part and overruled in part." It then "admit[ted] [only] those portions of the record that do not contain inappropriate hearsay."

Following the Department's case, Jimetra's counsel informed the court as follows:

Your Honor, I am also asking this Court to grant the Petition of the Department. The child, Jemitra [sic], is doing very well with the relative who she calls Renny. And, of course, she has had a very tragic incident when the grandmother, with whom she was for most of her life, died very suddenly.

She is going to kindergarten. She says that she would like to stay with Renny and talked [sic] with mommy on the phone. And her sister, India, who is also in the system now and adjudication is coming up next week, lives with her in the house.

We looked at the house, we spoke to the caretaker. We are satisfied that the child would be in a stable environment if staying there.

Appellant's attorney then made a proffer on behalf of her client. Appellant's counsel explained that Jimetra had lived with the maternal Grandmother with appellant's consent. Indeed, appellant had agreed with the Grandmother "that [Jimetra] should remain there and should grow up in [the Grandmother's] home." According to appellant's counsel, when Jimetra lived with the Grandmother, appellant "maintained contact with her mother and her child through telephone contact, as well as visits." After Jimetra was placed with a relative following the Grandmother's tragic and unexpected death, appellant did "not have an opportunity to see her child." Appellant's attorney explained:

The relative is a maternal cousin to my client who she does not have a relationship with, and the relationship, as such has deteriorated since the passing of the [G]randmother. There is some family tension as to what was the cause

of the [G]randmother's passing, which was a massive stroke; but that because of that tension between her and the cousin who is now caring for her children she does not have an opportunity to see her children. The only time she really sees the children are [sic] when they're in court. And when we were last in court, there was a very nasty exchange between the caretaker and the Mother. And so, that is one of the main reasons why she has not been able to maintain contact with her children.

Appellant's attorney also elaborated upon the situation that led appellant to leave Jimetra home alone on February 27, 1996. Appellant's lawyer explained that after Ms. W. was released from incarceration, she was enrolled in a drug treatment program as a condition of her probation. Initially, the program allowed its enrollees to bring their children. That policy was subsequently changed, however, and Ms. W. was faced with the dilemma of either leaving Jimetra alone in the house or violating her probation. Regrettably, Ms. W. made a decision to leave Jimetra at home, because "she didn't think she would be gone very long" and she felt that Jimetra "would be safe while she was gone."

According to appellant's lawyer, by the time of the termination hearing, appellant had maintained a stable home for approximately ten months and had been employed, full-time, for nine months. Therefore, she was in a position to care for Jimetra. Further, counsel said:

[T]hroughout the time [appellant's] child was placed with her mother she was wrestling with the decision about whether or not to let her mother raise her child. She had come to the conclusion to let her mother raise her child, but then her mother passed away, and she thought that would be an opportunity that she should step forward and regain custody of her children. That did not take place, and she has sought for her children to be returned to her since that time, that she's in a position to care for them, and that would be her testimony.

We shall include additional facts in our discussion.

## DISCUSSION

### A.

■ It is well settled that a parent has a fundamental, constitutional right to raise his or her own child. *See In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994); *In re Adoption/Guardianship No. J970013*, 128 Md.App. 242, 247, 737 A.2d 604 (1999); *In re Adoption/Guardianship No. 94339058/CAD*, 120 Md.App. 88, 97, 706 A.2d 144 (1998); *In re Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. 443, 454, 696 A.2d 1102 (1997); *see also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (acknowledging that a parent's "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"). Thus, cases involving termination of parental rights are often particularly difficult.

In *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388, the Supreme Court said: "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." The Court of Appeals similarly recognized the seriousness of such a proceeding in *Walker v. Gardner*, 221 Md. 280, 157 A.2d 273 (1960), stating:

[A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

*Id.* at 284, 157 A.2d 273; *accord Adoption/Guardianship No. 10941*, 335 Md. at 113, 642 A.2d 201; *Adoption/Guardianship No. 94339058/CAD*, 120 Md.App. at 97–98, 706 A.2d 144; *Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. at 454, 696 A.2d 1102.

In a termination case, the burden falls upon the State to prove, by clear and convincing evidence, that the termination of a parent's rights serves the best interest of the child. .*See Adoption/Guardianship 95195062/CAD*, 116 Md. App. at 454, 696 A.2d 1102. Indeed, "the best interest of the child is paramount." *Adoption/Guardianship No. 94339058/ CAD*, 120 Md.App. at 98, 706 A.2d 144; *see Adoption/Guardianship No. 10941*, 335 Md. at 112, 642 A.2d 201; *Adoption/Guardianship No. J970013*, 128 Md.App. at 247, 737 A.2d 604; *Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. at 453, 696 A.2d 1102.

F.L. § 5–313(a) provides, in part:

A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent ... if the court finds by clear and convincing evidence that it is in *the best interest of the child* to terminate the natural parent's rights as to the child and that:

\* \* \*

(2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child[.]

In cases such as this one, the trial court must also consider each of the factors enumerated in F.L. § 5–313(c) and (d). *See In re Adoption/Guardianship No. T96318005*, 132 Md. App. 299, 752 A.2d 646 (2000); *In re Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. at 457, 696 A.2d 1102; *In re Adoption No. 09598*, 77 Md.App. 511, 518, 551 A.2d 143 (1989); *see also In re Adoption/Guardianship No. T97036005*, 358 Md. 1, 22–24, 746 A.2d 379 (2000).

F.L. § 5–313(c) provides:

In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to

which the child is committed or by other agencies or professionals.

F.L. § 5–313(d), which governs considerations following a CINA adjudication, states:

(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able;

(iv) 1. the child was born:

A. addicted to or dependent on cocaine, heroin, or a derivative thereof; or

B. with a significant presence of cocaine, heroin, or a derivative thereof in the child's blood as evidenced by toxicology or other appropriate tests; and

2. the natural parent refuses admission into a drug treatment program or failed to fully participate in a drug treatment program; or

(v) the natural parent has:

1. subjected the child to:

A. torture, chronic abuse, or sexual abuse; or

B. chronic and life-threatening neglect;

2. been convicted [of a statutorily defined crime of violence against certain persons]; or

C. of aiding or abetting, conspiring, or soliciting to commit [certain crimes]; or

3. involuntarily lost parental rights of a sibling of the child.

(2) If a natural parent does not provide specified medical treatment for a child because the natural parent is legitimately practicing religious beliefs, that reason alone does not make the natural parent a negligent parent.

(3) The court shall consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

(4) The court shall waive the child placement agency's obligations under subsection (c) of this section if the court finds that one of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists.

(5) If the court finds that any of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists, the court shall make a specific finding, based on facts in the record, as to whether or not the return of the child to the custody of the natural parent poses an unacceptable risk to the future safety of the child.

■ Our role in the appellate review of termination cases was explained in *Adoption No. 09598*, 77 Md.App. at 518, 551 A.2d 143. There, we said:

[O]ur function ... is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the chancellor's determination that it would be in the best interest of [the child] to terminate the parental rights of

[the] natural [parent]. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

Thus, on appeal, "we must ascertain whether the trial court considered the statutory criteria, whether its factual determinations were clearly erroneous, whether the court properly applied the law, and whether it abused its discretion in making its determination." *Adoption/Guardianship No. 94339058/ CAD*, 120 Md.App. at 101, 706 A.2d 144; *see In re Adoption/Guardianship No. 3598*, 347 Md. 295, 311, 701 A.2d 110 (1997).

Before reviewing the court's findings, we shall first address two preliminary concerns raised by appellant in her brief.

## B.

Appellant argues that the evidence was insufficient to support the court's decision to terminate her parental rights. Although not raised by appellant as a separate issue, she bases her position, in part, on her claim that the court erred by admitting the Department's records. Appellant thus urges us to "decline to entertain considering any part of [the Department's] purported 'business record.'" Our answer to that is rather simple: we will not consider the Department's record in deciding this appeal, because that record was not included either in the record extract or in the record itself. In any event, appellant's position is without merit. We explain.

As we noted, the circuit court sustained the objection of the mother's attorney as to the admission of those parts of the Department's record that contained hearsay. Moreover, prior to rendering its oral opinion in this case, the court said: "[H]aving considered the evidence that was presented by way of proffer and the Court's very, very cursory review of the record, the Court makes the following findings."

Appellant maintains that it is nearly impossible to discern what parts of the Department's record the court may have considered. Nothing in the court's opinion suggests that it

relied on any evidence other than what was properly presented at the hearing. Moreover, appellant has not referred us to any item contained in that record that might have prejudiced her position.

Appellant's second concern appears in a footnote of her brief. There, she points out that F.L. § 5–313 was amended between the time Jimetra was placed with the Department in 1996 and the time of the Grandmother's death in January 1999. Further, she suggests that "the trial court's reliance on § 5–313(c) in its current form may have been misplaced." In light of "the procedural posture of this case," she seems to question whether the court should have considered the statute as it read when Jimetra came into care, rather than as it now appears. But, she does not provide us with any legal authority or analysis to establish that the court erred. Nor does she establish how or why the outcome would have been different even if the court relied on the earlier version of the statute. Because the amendments are relatively recent, and we have not been referred to any published opinion discussing them, we will address appellant's concern.

In early 1998, the Legislature repealed and reenacted F.L. § 5–313 through House Bill 1093. 1998 Md. Laws, Chap. 539. Effective July 1, 1998, former F.L. § 5–313 was amended to add current subsections (c)(1), (d)(1)(v), (d)(4), and (d)(5). House Bill 1093 created two substantive additions to F.L. § 5–313(c), now found in F.L. § 5–313(c)(1) and F.L. § 5–313(c)(2)(v). Although no substantive deletions were made, other changes were made to conform the statute to the new provisions. Consequently, former F.L. § 5–313(c)(1) through (c)(6) was redesignated as F.L. § 5–313(c)(2)(i) through (c)(2)(vi).

F.L. § 5–313(c)(1) requires the court to give "primary consideration" in a termination case "to the safety and health of the child." In our assessment of this recent amendment, we begin with well-established principles of statutory interpretation.

The fundamental rule of statutory interpretation is the determination and effectuation of the intent of the Legislature. *See State v. Bell,* 351 Md. 709, 717, 720 A.2d 311 (1998); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995). To ascertain that intent, we first look to the actual language of the statute. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455 (1997); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951 (1996). If the statute's language is plain and its meaning clear, we ordinarily do not look beyond the words of the statute itself. *Read v. Supervisor of Assessments,* 354 Md. 383, 393, 731 A.2d 868 (1999); *Kaczorowski v. Mayor and City Council of of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987). Nevertheless, "[w]e may always consider evidence of legislative intent beyond the plain language of the statute." *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996); *Kaczorowski,* 309 Md. at 514–15, 525 A.2d 628.

In deciding the plain meaning of a term, we may consult the dictionary. *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690 (1997); *Rouse–Fairwood Ltd. Partnership v. Supervisor of Assessments,* 120 Md.App. 667, 687, 708 A.2d 19 (1998). Of course, "[t]he 'meaning of the plainest language' is controlled by the context in which it appears." *Kaczorowski,* 309 Md. at 514, 525 A.2d 628 (quoting *Guardian Life Ins. Co. of Am. v. Insurance Comm'r,* 293 Md. 629, 642, 446 A.2d 1140 (1982)); *see Park & Planning Comm'n,* 348 Md. at 14, 702 A.2d 690 (stating that a "statute must be read in context taking into account related statutes or a statutory scheme"); *GEICO v. Insurance Comm'r,* 332 Md. 124, 131–32, 630 A.2d 713 (1993).

In analyzing the meaning of F.L. § 5–313(c)(1), we observe first that *Black's Law Dictionary* 826 (6th abr. ed. 1991) ("*Black's* "), defines "primary" as "[f]irst; principal; chief; leading. First in order of time, or development, or in intention." *Merriam–Webster's Collegiate Dictionary* 925 (10th ed. 1997) ("*Merriam–Webster's* "), as relevant to this case, defines "primary" as "of first rank, importance, or value." "Consider-

ation" is defined, in part, as: "1: continuous and careful thought ... 2 a: a matter weighed or taken into account when formulating an opinion or plan ... b: a taking into account ... 4: an opinion obtained by reflection." *Merriam–Webster's,* at 246.

▇▇▇ The plain meaning of the statute thus requires that when a trial court takes into account the factors enumerated in F.L. § 5–313(c) in order to determine the best interests of the child, the matter of the safety and health of the child is the overriding consideration. This interpretation is in accord with the legislative intent evidenced by the history of House Bill 1093 and related statutory enactments.

At its first reading, the bill contained a preamble that said:

WHEREAS, The goal of Maryland's child welfare system is safety and permanency for children; and

WHEREAS, The State's child welfare system is committed to preserve families when possible and to reunify children with parents when safe to do so; and

WHEREAS, The State recognizes that in some circumstances it is not possible or in the best interest of the child to return the child to the child's parents; and

WHEREAS, The State's child welfare system is committed to making reasonable efforts to ensure prompt permanency for children....

Although the preamble was subsequently deleted, its overarching principles appear to be embodied in the current version of F.L. § 5–303, which contains express legislative "findings." F.L. § 5–303, like F.L. § 5–313, was repealed and reenacted pursuant to 1998 Md. Laws, Chap. 539. Significantly, the reenactment added current F.L. § 5–303(b)(1). F.L. § 5–303 now provides:

(a) *In general.*—The General Assembly finds that the policies and procedures of this subtitle [9] that concern adoption are socially necessary and desirable.

---

**9.** The referenced "subtitle" is F.L., tit. 5, subtit. 3, governing adoption and guardianship with the right to consent to adoption. F.L. § 5–313 is included within the subtitle.

(b) *Purposes of subtitle.*—The purposes of this subtitle are to:

(1) provide children with stable homes that protect their safety and health;

(2) protect children from unnecessary separation from their natural parents;

(3) permit adoption only by individuals who are fit for the responsibility;

(4) protect natural parents from making a hurried or ill-considered decision to give up a child; and

(5) protect adoptive parents:

(i) by providing them information about the child and the child's background; and

(ii) from a future disturbance of their relationship with the child by a natural parent.

Thus, pursuant to F.L. § 5-303(b)(1), a purpose of the subtitle is to "provide children with stable homes that protect their *safety and health.*" (Emphasis added). Similarly, current F.L. § 5-313(c)(1) requires the court to give "primary consideration to the *safety and health* of the child." (Emphasis added).

As we see it, these legislative amendments reflect the unassailable tenet that "the 'golden rule' has always been the best interest of the child.'" *Adoption/Guardianship No. 3598,* 347 Md. at 323, 701 A.2d 110; *see Adoption/Guardianship No. 10941,* 335 Md. at 113, 642 A.2d 201. As the Court of Appeals said in *In re Adoption/Guardianship No. A91-71A,* 334 Md. 538, 561, 640 A.2d 1085 (1994):

[W]e have ... made clear that the controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interests of the child. We have said that in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of "transcendant importance."

Moreover, the obvious breadth of F.L. § 5–313(c)(1) suggests that it is a kind of "catchall" provision encompassing the specific criteria enumerated in F.L. § 5–313(c)(2). Indeed, it would seem impossible to give "primary consideration" to the child's health and safety without analyzing the other factors set forth in the statute. Thus, notwithstanding the Legislature's recent addition of a "primary" consideration to the analysis required under F.L. § 5–313(c)(1), "the court must review all relevant factors [contained in § 5–313(c)(2) ] and consider them together," *Adoption/Guardianship No. 94339058/CAD*, 120 Md.App. at 105, 706 A.2d 144, just as it always has done.

With the foregoing in mind, we turn to consider the second substantive addition to F.L. § 5–313(c), in what is now codified at F.L. § 5–313(c)(2)(v). There, the Legislature modified what was formerly F.L. § 5–313(c)(5) by inserting the phrase "the result of" at the beginning of the text. Thus, F.L. § 5–313(c)(2)(v) now provides that the court must give consideration to *"the result of* the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home." (Emphasis added); *see* 1998 Md. Laws, Chap. 539, § 1. In calling attention in her brief to the textual change to former F.L. § 5–313(c)(5), appellant implies that the insertion of the phrase "the result of" has placed a greater burden on a natural parent confronted with a termination proceeding. Yet, she does not advance any sound argument that the court's finding pursuant to current F.L. § 5–313(c)(2)(v) would have been different had it relied on former F.L. § 5–313(c)(5).

Again, consulting dictionaries for assistance, we see that *Merriam–Webster's, supra,* at 999, defines a "result," in part, as "something that results as a consequence, issue, or conclusion; *also* : beneficial or tangible effect." According to *Black's, supra,* at 356, an "effort" is "[a]n attempt; an endeavor; a struggle directed to the accomplishment of an object." Thus, prior to the enactment of House Bill 1093, in determining whether it was in a child's best interest to terminate a

natural parent's rights, the court was required to consider attempts made or struggles undertaken to make it in the child's best interest to return the child to the parent's home. Now, in rendering that same determination, the court must consider the effect of any attempts or struggles.

It appears to us myopic to think that, before the amendment, a court considering a parent's effort would not also, at least implicitly, consider the result of the parental effort. Moreover, we find it significant that, in amending former F.L. § 5–313(c)(5), the Legislature chose not to modify any of the subfactors formerly contained in F.L. § 5–313(c)(5)(i) to (c)(5)(iv). As we observed earlier, House Bill 1093 simply renumbered those subfactors as F.L. § 5–313(c)(2)(v)(1) to (c)(2)(v)(4).

In light of the foregoing, and even assuming that the court in this case should have applied former F.L. § 5–313(c), we are confident that the end result would have been the same. Accordingly, we turn to the statutory factors as considered by the court.

### C.

 Our view of the record reveals that the trial court addressed each factor in F.L. § 5–313(c) and (d), applied the statutory requirements to the facts, and found by clear and convincing evidence that it was in the best interest of Jimetra to terminate appellant's parental rights. Nonetheless, appellant argues that the Department failed to meet its burden. She specifically challenges the court's findings in connection with F.L. § 5–313(c)(2)(iii), (c)(2)(iv), and (c)(2)(v).

As discussed above, F.L. § 5–313(c)(1) requires the trial court to give "primary consideration to the safety and health of the child" in determining whether it is in the child's best interest to terminate parental rights. As to this factor, the court found, and appellant does not challenge:

> [T]hat the Department ... has met and is meeting the safety and health needs of this child. The Court finds, conversely, that Mother has not and is not currently meeting the safety and health needs of the child.

Appellant has not raised an objection to the findings under F.L. § 5–313(c)(2)(i). Under that subsection, the court must consider "the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent." In this regard, the court stated:

The Court notes that this case came in for—as a result of a neglect report in March of 1996—actually, February of 1996, and exactly one month later there was a stipulation entered into between the Department, the Court, and the Mother, and child's counsel, but in that stipulation the Mother was referred to drug treatment and parenting classes. So the Court does find that there were early and appropriate services offered.

And then almost two months later when the case finally went to disposition, there was another stipulation and this stipulation required Mother to enter into drug treatment and complete parenting classes. The Court also notes that the Department did obtain relative resources, so the Court does find the Department did offer timely and appropriate services.

Under F.L. § 5–313(c)(2)(ii), the court must consider "any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement." Here, the court observed that no social service agreement existed, despite "the fact that the May 23rd, 1996, stipulation required the Mother to enter into a[n agreement]." The court then found that appellant "did not make herself available" so that an agreement could be executed.

F.L. § 5–313(c)(2)(iii) requires the court to consider "the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest." The court found a bond between Jimetra and Sherine, as well as a bond between Jimetra and India. The court acknowledged that "[t]here is a bond of sorts between [Donna W.] and

[Jimetra], but the Court does not find that to be the same as a parental bond." With the exception of the court's finding that her daughters had a bond with each other, appellant alleges that the proffers did not support these findings. As to the bond between Jimetra and Sherine, appellant seemingly ignores the Department's proffer that Jimetra "made an appropriate adjustment" to Sherine's home. Perhaps more significant were statements made by Jimetra's counsel that Jimetra was doing well and wanted to stay with Renny.

Appellant also challenges the court's finding under F.L. § 5–313(c)(2)(iv). Under that subsection, the court must review "the child's adjustment to home, school, and community." The court found that Jimetra had "adjusted quite well in, in her home, school, and community." Appellant maintains that the court's finding was not supported by the proffers. We disagree.

Jimetra's counsel stated that Jimetra "is going to kindergarten" and, as noted in connection with F.L. § 5–313(c)(2)(iii), appeared content with Sherine and in Sherine's home. Nevertheless, even if this determination were erroneous or the record were inadequately developed to support the court's finding, there is ample other evidence in the record to uphold the court's finding that it was in Jimetra's best interest to terminate Donna W.'s parental rights. As we said in *Adoption/Guardianship No. 94339058*, 120 Md.App. at 105, 706 A.2d 144: "F.L. § 5–313(c)[ (2) ] does not require a trial court to weigh any one statutory factor above all others. Rather, the court must review all relevant factors and consider them together."

As discussed, *supra*, F.L. § 5–313(c)(2)(v) requires the court to consider "the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home," including those factors set forth in F.L. § 5–313(c)(2)(v)(1) and (c)(2)(v)(3).[10] Pursu-

10. The court stated that there was no evidence that appellant "did pay, could pay or was asked to pay" any part of Jimetra's care, pursuant to

ant to F.L. § 5–313(c)(2)(v)(1), the court observed that appellant "maintained, at best, sporadic visits, even fewer visits now that the child is with a different relative." Consequently, the court found that appellant's visits with Jimetra were "incidental." As to this finding, appellant contends that the record does not support the court's conclusion, in view of the conflicting proffers.

In support of her position, appellant has referred us to two transcript pages. The first contains the following proffer by the Department's counsel at the termination hearing: "[S]ince 1996, ... Mother's visits to the child have been somewhat sporadic, although they have been interrupted by a period of time when Mother was incarcerated again after 1996." The second reference is to the proffer of appellant's attorney that appellant "maintained contact with her mother and her child through telephone contact, as well as visits."

■ To be sure, a court cannot resolve evidentiary disputes on the basis of conflicting proffers. This is because "there is no proper way to resolve the evidentiary conflicts in order to determine ultimate facts which would be sufficient in law...." *Polk v. State*, 85 Md.App. 648, 656–57, 584 A.2d 1274 (1991); *see also Barnes v. State*, 31 Md.App. 25, 34–35, 354 A.2d 499 (1976). Any issue concerning alleged variances in the proffers could have been easily avoided by the presentation of testimony. We do not agree, though, that the proffers were truly conflicting, or that the court resolved any conflicts that did exist. In the case at bar, the trial court properly based its verdict on the facts before it that were undisputed. To the extent proffers conflicted, the conflicts were not material.

F.L. § 5–313(c)(2)(v)(1) requires the court to consider "the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent." But, that subsection precludes the court

---

F.L. § 5–313(c)(2)(v)(2). Subsection (c)(2)(v)(4) is not applicable because the child had been in foster care for more than 18 months.

from giving "significant weight to any incidental visit, communication, or contribution." The proffers did not indicate that appellant was, at any time prior to January 1999, working toward reunification with her daughter. Moreover, there was nothing specific in the proffer of appellant's counsel to show regular contact. Appellant's proffer, to the effect that she maintained telephone contact with her child and had "visits" with her child while the child resided with the Grandmother, did not contradict the Department's position that her contact was sporadic. Instead, without reference to duration or frequency, the statement alleged, generally, that the mother had contact with her child when the child resided with the Grandmother. Appellant's attorney essentially conceded that the mother had almost no contact with Jimetra once the child began to live with the maternal relative, because of tension in that relationship.

With respect to F.L. § 5–313(c)(2)(v)(3), the court stated that there was no evidence to suggest appellant maintained regular contact with the Department, as Jimetra's legal custodian, but noted that there was evidence to suggest that appellant maintained some contact with the Grandmother "as the de facto custodian" when Jimetra was in her care. Appellant does not dispute that finding.

F.L. § 5–313(c)(2)(vi) requires consideration of "all services offered to the natural parent before the placement of the child." The court noted that Donna W. "was on parole and, as a result of that parole, earlier parole, she was receiving drug treatment when the case came into the Department's attention back in February of 1996." Although no further references to services were made, appellant has not contested the court's finding.

The court also reviewed those factors contained in F.L. § 5–313(d). Although appellant has not challenged any of the court's findings under F.L. § 5–313(d), we will briefly highlight the determinations made as to the relevant subsections, because of the importance of the issue.

Under F.L. § 5–313(d)(1)(i), the court is required to consider whether "the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time." Here, the court found no such disability.

F.L. § 5–313(d)(1)(ii) requires the court to determine whether "the natural parent has committed acts of abuse or neglect toward any child in the family." The court stated that it "believe[d] that the Mother having left this child and a sibling [11] home alone in February of 1997 to be neglect, indica of neglect, but the Court, I guess, should possibly weigh that with the fact that Mother was ... going to drug treatment during that time."

The court found no evidence of the conditions contained in F.L. § 5–313(d)(1)(iii), (d)(1)(iv), or (d)(1)(v). Additionally, it found no evidence that would invoke subsection (d)(2) and, pursuant to (d)(3), it declined to waive the Department's obligations under F.L. § 5–313(c).[12]

We applaud appellant for her efforts to maintain a stable home and obtain gainful employment for a period of months. Nevertheless, we are satisfied from our review of the record that the court did not err or abuse its discretion in concluding that the Department met its burden of proving, by clear and convincing evidence, that termination of appellant's parental rights was in Jimetra's best interest.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

11. There is no indication in the record that appellant left India alone in her home on February 27, 1996.

12. Neither F.L. § 5–313(d)(4) or (d)(5) was applicable in light of the absence of findings under subsection (d)(1)(v).