786 A.2d 64

**In re ADOPTION/GUARDIANSHIP NO. T00032005.**

No. 00279, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 4, 2001.

Argued by Joan F. Little (Belhia V. Martin, on the brief), both of Baltimore, MD.

Argued by C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), both of Baltimore, MD.

Argued before HOLLANDER, and JAMES R. EYLER and WILLIAM W. WENNER, (Retired, specially Assigned), JJ.

HOLLANDER, J.

In this termination of parental rights case, we must consider whether a child has the right to withdraw his statutory consent to a petition seeking termination of parental rights. John B., Jr. ("John"), appellant, the minor child of Sheri H. and John B., Sr., complains, *inter alia*, that the Circuit Court for Baltimore City erred or abused its discretion when it did not permit him to withdraw his "deemed consent" to a Petition for Guardianship, with the Right to Consent to Adoption or

Long Term Care Short of Adoption ("the Petition"). The Petition was filed on February 23, 2000, by the Baltimore City Department of Social Services ("the Department" or "DSS"), appellee, when John was ten years of age. The circuit court subsequently granted the Petition.[1]

From the time that John came into the Department's care in 1995, he was placed with his paternal grandparents, Christine and Melvin G. Because John was happy with that placement, he did not object to the Petition and was deemed to have consented to it. However, both before and at the termination of parental rights ("TPR") hearing on March 28, 2001, John's counsel advised the court that John no longer agreed to the Petition. Claiming that John is deeply "attached" to his mother and has "strong ties" to his two siblings, his attorney sought to revoke John's statutory consent, and voiced John's opposition to the Petition.

On appeal, John presents three questions for our review, which we have reordered and rephrased slightly:

I.   Did the trial court err in failing to consider whether the child's changed circumstances warranted relief from the 30–day response deadline to the show cause order?

II.  Did the trial court err in failing to consider evidence regarding John's family ties?

III. Was the evidence sufficient to support the termination of parental rights?

For the reasons set forth below, we shall affirm.

## FACTUAL SUMMARY

John was born on July 10, 1989. He has a younger half sister, Shunta F., born on January 3, 1993, and an older half

---

1. Neither parent is a party to this appeal. Ms. H., who objected to the Petition, appeared through counsel at the hearing, but she has not appealed the circuit court's ruling. John B., Sr. neither objected to the Petition nor attended the hearing.

We observe that the mother's name is spelled variously as Sherri, Sherry, and Sheri. We shall use the spelling as it appears in appellant's brief.

brother, James H., born on March 12, 1984. The Department filed a termination petition as to John and Shunta, but not as to James.[2] DSS acknowledges that John is "close" to his siblings.

Shortly after Shunta's birth, the hospital reported that both she and Ms. H. tested positive for drugs. Nevertheless, the three children did not come into care until August 1995, when they were removed because Ms. H.'s drug problem interfered with her ability to care for the children. At the time, the children ranged in age from eleven to two. When John was removed, he was immediately placed with his paternal grandparents, with whom he has resided ever since. In his brief, appellant recognizes that "[t]here is no question but that John's current placement with his grandparents affords him a stable environment."

On September 14, 1995, by agreement of the parties, the children were found to be children in need of assistance ("CINA") and committed to the Department. Thereafter, beginning in 1995, Ms. H. entered several service agreements. In John's brief, he concedes that his mother "failed to adhere" to those agreements.

On August 4, 1995, Ms. H. entered her first service agreement, in which she agreed to obtain drug treatment and attend parenting classes. On August 15, 1995, she also agreed to a safety plan, in which she acknowledged her drug problem and her failure to provide proper care for her children. Further, she agreed to enter a drug detoxification and treatment program.

Ms. H. executed a second service agreement on November 22, 1995, in which she again agreed to complete drug treatment, obtain a stable home, and attend parenting classes. On the same day, she entered a residential drug treatment program, but left just three days later. She did not comply with

---

2. The court heard the Petition as to Shunta at the same time that it heard the Petition as to John. Shunta has not challenged the court's ruling granting the Petition.

the provisions of the service agreement or the safety plan. Ms. H. subsequently had "sporadic contact" with her caseworker. On November 23, 1999, Ms. H. entered yet another service agreement, which again provided for drug treatment, parenting classes, and stable housing. Ms. H. did not comply with its terms.

Throughout this time, John consistently desired both sibling and parental visitation. Although the Department recommended regular sibling visits, John frequently complained about the inadequacy of visitation. In its transfer summary dated August 12, 1996, the Department acknowledged that "John needs to visit with his siblings. He is very close to his brother."

When John was nine years old, he expressed a desire "to grow up with his paternal grandparents." At that time, neither of John's parents had maintained regular contact with the Department, even though they saw John occasionally. Accordingly, on or about March 22, 1999, the parties agreed to a permanency plan for John of relative placement for the purpose of adoption or custody and guardianship.[3]

On July 28, 1999, the Department wrote a letter to John Sr., informing him that DSS was initiating termination of parental rights because John had been in care for "too long." In a stipulation of September 29, 1999, the Department noted that the permanency plans for all three children were subject to change and were pending reevaluation by the Show Cause Committee. The Department subsequently changed the permanency plan for John and Shunta to adoption, while the permanency plan for James H. continued to be long-term foster care.

As we noted, DSS filed the Petition on February 23, 2000, when John was ten years old. A Show Cause Order was

---

3. Appellant points out that a permanency plan of relative placement for the purpose of adoption or custody and guardianship differs from a permanency plan for adoption. It does not necessarily require or contemplate a termination of parental rights. See Md.Code, Fam. Law § 5–525(e)(2).

served on Ms. H. on April 17, 2000, and she timely objected. John's father was served with the Petition on June 4, 2000, and did not object. By motion on May 2, 2000, John's counsel complained about service of the Show Cause Order on appellant. As a result, on May 5, 2000, when John was about two months shy of his eleventh birthday, the Department reserved the Show Cause Order on John's attorney. Accordingly, at a hearing on June 6, 2000, John's counsel withdrew her motion challenging service of the Show Cause Order. She also said: "We have no objection to the TPR at this time." Nevertheless, John's attorney expressly sought to preserve John's "right to be able to participate" fully at the TPR hearing. DSS did not object to that request, and the court responded: "Just in case. Right, right."

John explains that, initially, he did not oppose the termination of parental rights, because he "was in a stable situation with his grandparents and was happy to stay with them." Over the next several months, however, as John continued to mature and grow "very close" to his family, he changed his mind. Accordingly, at a conference on January 9, 2001, John's counsel informed the circuit court that John had "undergone developmental changes and [he] was no longer in favor of the termination." The court gave John's lawyer an opportunity to speak with John and to determine whether counsel had to withdraw from her dual representation of John and Shunta, to avoid a possible conflict. John's counsel subsequently advised the court on January 16, 2001, that John was, indeed, "adamantly opposed to termination." Accordingly, the court appointed a new attorney for Shunta.

At the termination of parental rights hearing on March 28, 2001, neither Ms. H. nor John was present, but both were represented by counsel. John's counsel advised the court, without objection, that John wanted to remain in the care of his paternal grandparents, but opposed the severance of legal ties to his parents and siblings. Further, she explained that John "considered himself a part of his biological family," and wanted to maintain a relationship with his siblings. Suggesting to the court that termination of parental ties would

"devastate" John, his lawyer urged the court to allow John to withdraw his prior consent to the Petition and to deny DSS's request.

At the TPR hearing, all the parties proceeded by proffer, without any limitation imposed by the court. In connection with its proffer, the Department offered its entire record as an exhibit, although the court admitted only those portions "which do not contain inappropriate hearsay." With respect to the proffer made by John's counsel, the following colloquy is relevant:

[THE COURT]: [John's lawyer], any evidence or proffer as to John's case?

[APPELLANT'S ATTORNEY]: Yes, Your Honor. Let me say that if John B. was here he would try to explain to the court at 11 years old exactly what has personally happened to him with regard to both his mother, his father and now his caretaker[s], his paternal grandparents.

As the State has shown, John has, in fact, been with the department since the early age of 1995[sic], has had the department's involvement, but from his perspective he's been with his family. His primary caretakers are his grandparents, his paternal grandparents.

If he was here he would talk about how he treasured the visits that he does have with his mother, and that he honors and would love to be able to keep a relationship with his mother that would not entail termination of parental rights.

In addition to that, he does have contact with his father because he's with his paternal grandparents and, in fact, would find it devastating if, in fact, his parents' legal ties and all other ties were terminated at this time.

To the extent that a child can understand what termination of parental rights mean, and to the extent that counsel could explain that, I think that John clearly did not understand the magnitude of what that meant until January 2000, at which time he intimated to his counsel that he was not in favor of TPR.

In this instance at one time I thought there was some confusion as to whether—

[THE COURT]: For January 2001.

[APPELLANT'S ATTORNEY]: 2001, I'm sorry, Your Honor. Thank you. Counsel talked with John extensively about his comprehension of that, and I think it was at that time that he clearly said no, I really don't want this to happen.

What we're asking for the court to do is to recognize first of course his right to be able to get a cognitive point of understanding what that meant, and two, to respect that with regard to the emotional, psychological, and legal ramifications of his right to be terminated.

I know for the record it was the early stipulation intimate to that [sic]. At one time James (inaudible) was part of this, his brother. The Department did not choose to request termination of parental rights for him. He's 16 years old.

I think that those boys are very, very close and bonded, and, in fact, we represent all three children, and I think to the extent that both of these boys understand now what that means it is incumbent upon the court for the best interests of this child, given the psychological and emotional damage that could happen to him, that termination of parental rights not be entered, an order for that not be entered.

[THE COURT]: And with that John rests?

[APPELLANT'S ATTORNEY]: John rests.

Ms. H.'s attorney made the following proffer:

[THE COURT]: [Mother's attorney], any evidence on behalf of Ms. H?

[MOTHER'S ATTORNEY]: Yes, Your Honor. Other than my client is not here today, she did, through her objection, advise the court and has indicated that her desire is to not have her rights terminated with regard to her children.

Your Honor, as you heard that particularly with John, although she has not been around, she's not here today and she's had a rocky experience with the Department of Social

Services, she has always, throughout all these proceedings, maintained some contact with the Department of Social Services and with her children.

And, in fact, apparently it's been enough that it's been demonstrated by the 11 year old that her involvement and contact has been enough to maintain his bonding with her. And, Your Honor, I would ask today that her rights not be terminated and that this child's desires be acknowledged and that his acknowledgment also go for the benefit of the parent, and that her contact is enough that it warrants her being able to maintain her parental rights with regard to this child, and, in fact, with regard to both children. So Your Honor, I'd ask that the Department's petition for termination be denied.

The Department argued as follows:

[COUNSEL FOR DSS]: ... Your Honor, without going through the details of my proffer, I would state to the court that clearly in this case the Department has shown that we did make efforts to work with the mother. As late as 1999 the Department of Social Services did enter into a service agreement with her.

As far as the father is concerned, again even we [sic] signed a service agreement well after the 18 month period in 1998, and even at the most recent court review in 2000 when he expressed an interest in a relative resource we did explore that resource, so clearly, Your Honor, we have made efforts in this case to continually work with the parents well beyond statutory requirements.

Your Honor, as to Shunta clearly she's in a stable placement. There seems to be no argument from child's counsel as to Shunta. As to John, however, the testimony has been clear that he is in a stable and loving placement. It is a family placement.

He is—because of that placement he does have some access to his biological family, which is a benefit for him, and [that] will continue to take place, my guess is, after

termination of rights takes place if this court does grant it. . . .

After a review of the requisite statutory factors set forth in Md.Code (1999 Repl.Vol., 2000 Supp.), § 5–513 of the Family Law Article ("F.L"), the court granted the Petition.

We shall include additional facts in our discussion.

## DISCUSSION

### A.

It is beyond cavil that a parent has a fundamental right to raise his or her own child. *In re Mark M.,* 365 Md. 687, 782 A.2d 332(2001); *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662 (1998); *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994); *see also Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (recognizing the "fundamental liberty interest" of the parent "in matters of family life. . . ."); *In re Adoption/Guardianship No. J970013,* 128 Md.App. 242, 247, 737 A.2d 604 (1999); *In re Adoption/Guardianship No. 94339058/CAD,* 120 Md.App. 88, 97, 706 A.2d 144 (1998); *In re Adoption/Guardianship No. 95195062/CAD,* 116 Md.App. 443, 454, 696 A.2d 1102 (1997). Similarly, this Court has recognized that a child has a constitutionally protected liberty interest in the preservation of parental rights. *In re Adoption/Guardianship No. 6Z970003,* 127 Md.App. 33, 50–51, 731 A.2d 467 (1999). Although the Court of Appeals has not decided that precise constitutional issue, it has said that a child "ordinarily has an interest in maintaining a close familial relationship with siblings" and other family members. *In Re Adoption/Guardianship No. T97036005,* 358 Md. 1, 16, 746 A.2d 379 (2000).

In *Santosky,* 455 U.S. at 759, 102 S.Ct. 1388 the Supreme Court said that, "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." Similarly, the

Court of Appeals recognized the seriousness of such a proceeding in *Walker v. Gardner*, 221 Md. 280, 284, 157 A.2d 273 (1960), stating:

[A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

*Accord Adoption/Guardianship No. 10941,* 335 Md. at 113, 642 A.2d 201; *Adoption/Guardianship No. 94339058/CAD,* 120 Md.App. at 97–98, 706 A.2d 144; *Adoption/Guardianship No. 95195062/CAD,* 116 Md.App. at 454, 696 A.2d 1102.

Nevertheless, as the Court of Appeals recently reiterated, the parents' "fundamental interest ... is not absolute and does not exclude other important considerations." *In Re Mark M.,* at 343. Indeed, notwithstanding the harsh nature of a termination proceeding, it is unassailable that the paramount consideration is the best interest of the child. *Boswell,* 352 Md. at 219, 721 A.2d 662; *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 323–24, 701 A.2d 110 (1997); *In Re Adoption/Guardianship No. 10941,* 335 Md. at 112, 642 A.2d 201; *In re Adoption/Guardianship No. J970013,* 128 Md.App. at 247, 737 A.2d 604. As the Court underscored in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 561, 640 A.2d 1085 (1994):

[W]e have ... made clear that the controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interests of the child. We have said that in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of "transcendant importance."

Given the gravity of a TPR case, and the compelling nature of the best interest standard, the General Assembly has provided a detailed statutory scheme that must be satisfied before termination may be ordered. To determine what is in a child's "best interest," the trial court must consider and address all relevant statutory criteria. *In re Adoption/Guardianship No. 87A262*, 323 Md. 12, 19–20, 590 A.2d 165 (1991); *see In re Abiagail C.*, 138 Md.App. 570, 587, 772 A.2d 1277 (2001); *In re Adoption/Guardianship No. T98314013*, 133 Md.App. 401, 416, 758 A.2d 552 (2000). The Court has said: "In cases where parental rights are terminated, it is important that each factor be addressed specifically not only to demonstrate that all factors were considered but also to provide a record for review of this drastic measure." *In re Adoption/Guardianship No. 87A262*, 323 Md. at 19–20, 590 A.2d 165; *see In re Adoption/Guardianship No. T97036005*, 358 Md. at 23, 746 A.2d 379; *In re Adoption/Guardianship No. T96318005*, 132 Md.App. 299, 311, 752 A.2d 646 (2000).

Because a TPR decree severs the legal ties of parent and child, the burden falls on the State to prove its case by clear and convincing evidence. *See In re Adoption/Guardianship No. T98314013*, 133 Md.App. at 412, 758 A.2d 552. Accordingly, F.L. § 5–313(a) provides: "A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent [only] . . . if the court finds *by clear and convincing evidence* that it is in the best interest of the child to terminate the natural parent's rights as to th[at] child . . . ." (Emphasis added). We turn to review other pertinent statutory provisions.

F.L. § 5–313(c) states, in part:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1.   the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2.   if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3.   the maintenance of regular communication by the natural parent with the custodian of the child;  and

4.   whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation;  and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to

which the child is committed or by other agencies or professionals.

When, as here, a child has been adjudicated a CINA, the court must also consider the provisions set forth in F.L. § 5–313(d). That section provides:

(d) *Considerations following juvenile adjudication.*—

(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able;

(iv) 1. the child was born:

A. addicted to or dependent on cocaine, heroin, or a derivative thereof or

B. with a significant presence of cocaine, heroin, or a derivative thereof in the child's blood as evidenced by toxicology or other appropriate tests; and

2. the natural parent refuses admission into a drug treatment program or failed to fully participate in a drug treatment program; or

(v) the natural parent has:

1. Subjected the child to:

A. torture, chronic abuse, or sexual abuse; or

B.  chronic and life-threatening neglect;

2.  been convicted [of a statutorily defined crime of violence against certain persons]; or

C.  of aiding or abetting, conspiring or soliciting to commit [a crime]; or

3.  involuntarily lost parental rights of a sibling of the child

(2) If a natural parent does not provide specified medical treatment for a child because the natural parent is legitimately practicing religious beliefs, that reason alone does not make the natural parent a negligent parent.

(3) The court shall consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

(4) The court shall waive the child placement agency's obligations under subsection (c) of this section if the court finds that one of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists.

(5) If the court finds that any of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists, the court shall make a specific finding, based on the facts of the record, as to whether or not the return to the child to the custody of the natural parent poses an unacceptable risk to the future safety of the child.

On appeal, we must " 'ascertain whether the trial court considered the statutory criteria, whether its factual determinations were clearly erroneous, whether the court properly applied the law, and whether it abused its discretion in making its determination.' " *In re Adoption/Guardianship No. 94339058/CAD*, 120 Md.App. at 101, 706 A.2d 144 (citation omitted); *see In Re Adoption/Guardianship No. 3598*, 347

Md. at 311, 701 A.2d 110.   In explaining the role of appellate review in a termination case, we have stated:

> "[O]ur function ... is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the chancellor's determination that it would be in the best interest of [the child] to terminate the parental rights of [the] natural [parent].   In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court."

*In re Adoption/Guardianship No. T98314013,* 133 Md.App. at 415–16, 758 A.2d 552 (citation omitted).

Appellant lodges numerous challenges to the court's ruling granting the Petition.   John maintains that the trial court erred when it refused to consider whether his changed circumstances—increased maturity and heightened appreciation for the significance of a TPR ruling—warranted relief from his deemed consent to the Petition.   At the hearing, appellant's counsel proffered that, "[a]s [John] grew older and gathered a greater understanding of the long-term consequences of termination, the potential for psychological and emotional damage arising from termination of [parental] ties was likely to increase."

John also relies on F.L. § 5–313(c)(2)(iii), and complains that the court failed to consider his emotional ties to his parents and siblings when it determined his best interests. He asserts that the court erred because it "ignored the consistent and uncontroverted evidence in the record of John's strong [familial] ties to his siblings" and his mother.   In this regard, John points to his consistent efforts to maintain visitation with his family and his feelings of affection for them.

Further, John complains that "[l]ittle evidence was proffered" as to the statutory factors, apart from the service agreements.   For example, appellant suggests that the court gave "extremely short shrift" to F.L. § 5–313(c)(2)(i), concern-

ing the extent of services offered by DSS to his mother to facilitate reunification. Apart from furniture provided in 1995 and some referrals for drug treatment, John observes that there was no evidence of services to his mother to facilitate reunification, a factor that "deserves particular attention...."

John also claims that, on the whole, the record is insufficient to support the court's ruling that it was in his best interest to grant the Petition. He maintains that the Department presented "flimsy evidence" that did not support termination, and complains that the court's ruling was "based on the slimmest of proffers, hardly the weighty 'clear and convincing' evidence required to support a severance of parental rights." Rather, he asserts that DSS did not meet its "exacting burden," and that the weight of the evidence "tips decisively against termination." In support of his position, John observes that the trial court issued its decision immediately after the parties rested, and perfunctorily "went through the motions of addressing" the statutory factors.

According to appellant, the Department and the court also erred in assuming that John would be able to maintain his "critical" family ties even if the Petition were granted. John argues that "the Department's decision to proceed with termination was not based on the application of permanency plan priorities, but on the amount of time that had elapsed since John had been brought into care." He relies on F.L. § 5–525(e), which states:

(e) Development of a permanency plan.—(1) In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child.... (2) To the extent consistent with the best interest of the child in an out-of-home placement, the local department shall consider the following permanency plans, in descending order of priority:

(i) returning the child to the child's parent or guardian, unless the department is the guardian;

(ii) placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted;

(iii) adoption in the following descending order of priority:

(1) by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationships and family ties; or

(2) by another approved adopted family;

(iv) an independent living arrangement; or

(5) in long-term foster care.

Appellant argues that DSS had an alternative to termination of parental rights, stating:

There is no question but that John's current placement with his grandparents affords him a stable environment. There is also no question, as set forth above, that his stability is fostered, if not dependent upon, his continued visits with his siblings and family members. Both goals can be achieved by keeping John in the long term care of his relatives. John's counsel urged the Court to consider the existence of an alternative to termination—continued relative placement with his grandparents—as in his best interest and therefore a strong reason to deny the Petition.

### B.

We first consider John's claim that the trial court erred or abused its discretion in refusing to consider whether a child's change in circumstances warrants relief from the 30-day response deadline to a show cause order. We begin with a review of the applicable statutory provisions.

F.L. § 5–317(c) provides:

(c) *Requirements for granting petition.*-Except as provided in §§ 5–313 and 5–313.1 of this subtitle, the court may grant a decree awarding guardianship only:

(1) after any investigation and hearing the court considers necessary; and

(2) with the consent of each living natural parent of the child.

F.L. § 5–317(e) is also pertinent. It states:

(e) *Revocation of consent.*—In a proceeding for guardianship, consent may be revoked at any time within 30 days after the consent is signed.

Further, F.L. § 5–322(d) provides:

(d) *Failure to respond or waiver of notification.*—If a person is notified under this section and fails to file a notice of objection within the time stated in the show cause order or if a person's notification has been waived under subsection (c) of this section:

(1) the court *shall* consider the person who is notified or whose notice is waived to have consented to the adoption or to the guardianship; and

(2) the petition shall be treated in the same manner as a petition to which consent has been given.

(Emphasis added).

Title 9 of the Maryland Rules is called "Family Law Actions." Maryland Rule 9–107(a) states: "Any person having a right to participate in a proceeding for adoption or guardianship may file a notice of objection to the adoption or guardianship...." Rule 9–107(b)(1) states, in part: "[A]ny notice of objection to adoption or guardianship *shall* be filed within 30 days after the show cause order is served." (Emphasis added).

[3] John's attorney was served with the Petition and Show Cause Order on May 11, 2000, pursuant to F.L. § 5–322(a)(1)(ii)(1). No objection was ever filed on John's behalf. Therefore, pursuant to F.L. § 5–322(d), John was deemed to have consented to the Petition. Nevertheless, John claims that the trial court erred or abused its discretion because it did not allow him to withdraw his deemed consent.

Appellant states that "there are situations, which we expect will be relatively infrequent, when changed circumstances should require the trial court to consider whether relief from those timelines is necessary to enable the court to protect the best interest of the child." Because children continue to mature and gain greater appreciation for the significance of a termination proceeding, John urges that, upon request, "the trial court should determine whether the child's changed circumstances warrant relief from his earlier position." Therefore, he maintains that a trial court must have discretion to allow a child to change his or her mind, based on changed circumstances. John points to his increased maturity and corresponding appreciation for the importance of a TPR order as the kind of change in circumstances that justified his request to revoke his consent.

It is undisputed that John's failure to object was not inadvertent. Indeed, he acknowledges in his brief that he wanted "to grow up with his paternal grandparents," and "was happy to stay" with them. On the other hand, John was just ten years old when the Petition was filed in February 2000. A year later, he sought to withdraw his consent, as a result of ensuing "developmental changes" and his increasing maturity. John maintains that "[h]is intervening intellectual and emotional development led him to [gain] a greater understanding of the significance of termination. . . ." At that point, although John still "wanted to remain with his paternal grandparents, he was strongly opposed to cutting off" his legal ties to his family.

To be sure, in the life of a child, a year hopefully provides an opportunity for significant intellectual and emotional growth, of a kind that is not generally associated with a comparable period in adulthood. Based on the circumstances of this case, however, we are satisfied that, in effect, John was allowed to withdraw his consent, because he had a full opportunity to advise the court of his opposition to the TPR. Moreover, the court considered John's view, even though the court was not certain whether the statute permitted John to

interpose a belated objection or revoke his consent. We explain.

As we observed, John's attorney expressly represented to the court that John, who was eleven at the time of trial, had changed his mind and opposed termination of parental rights. John's lawyer explained that, until January 2001, John "clearly did not understand the magnitude" of a termination ruling. In view of John's "cognitive point of understanding what termination meant," and his close familial bonds, his counsel asked the court to deny the Petition. Significantly, DSS did not object to the proffer made by John's lawyer, nor did the court restrict John's opportunity to present his proffer.[4]

Subsequently, in closing argument, counsel for DSS said:

[COUNSEL FOR DSS]: Your Honor, I do feel compelled to bring to your attention that this case is one of those cases that straddles the Christopher [C.] time lines. On May 11th of 2000 we served [child's counsel] ... as to this petition....

\* \* \*

And, Your Honor, we have no indication in our file that there is an objection on behalf of either of her clients at the time both children were her clients and there's no indication that there is an objection. So, Your Honor, according to Christopher [C.] standards her client has consented.

And, Your Honor, I can see that I feel that this is an ugly way to go when you've heard the expression of her client. However, we served her in May. She had 30 days at that time to object, and there is no objection.

THE COURT: To the extent—and [John's counsel], I'd love to hear from you in a few minutes, but to the extent that [counsel] on behalf of a child post Christopher [C.][is] clearly entitled to participate and participated by way of proffering his position, and I assume you'd argue not just in

---

4. None of the parties has suggested that DSS's failure to object amounted to a waiver of its current position.

rebuttal but would argue that position, [DSS's attorney], what weight, if any, do you think the court should give or could give the testimony—to the extent there was any testimony that was adverse to a consenting position and whatever argument is inconsistent to a consenting position because I think you are right under Christopher [C.], if a timely objection was not filed then John is deemed to have consented.

[COUNSEL FOR DSS]: Your Honor, my understanding or my interpretation of the continued presence of children's attorneys where we have a child who has consented is to protect the rights of the minor child who, under the law, is considered to be disabled.

THE COURT: Disabled.

[COUNSEL FOR DSS]: And that is my understanding or that's my interpretation of why the attorneys continue to participate. But, Your Honor, if we are to interpret Christopher [C.], Christopher [C.] was very clear that the child is a party as the parents are....

I don't believe you can attach—*you can attach only minimal weight to that testimony. I don't think it's possible necessarily for the court to entirely ignore it, but frankly she failed to file notice of objection.*

This child is deemed to have consented by operation of law, and, Your Honor, frankly it's an issue for growing children.

\* \* \*

[JOHN'S ATTORNEY]: There are two narrow issues, as I see it. One is that—and I'm going to say some things that I think that are in some ways procedural in terms of all of our interpretation of Christopher [C.] and that period of time.

If the court will recall, when service was not made on this I filed a motion objecting to the improper service. We came into court. We had a hearing, and we—I withdrew my motion on the basis of the show cause because later we were served.

At that hearing I recalled saying that we were reserving our right to participate because I think that at that time everyone was thinking that—the interpretation of Christopher [C.] you, in fact, were still allowed to participate then you were okay, that the child's rights would be protected.

Subsequent to that I think there has been some interpretation by case law where parents, in fact, have come in arguing about the 30 day. I believe that for the best interests of the child there is a differential that should be recognized by the court with regard to why counsel is present.

And I think that but for the fact—but for the court allowing to stand here to talk about John I would have been outside this courtroom and not be able to express what really I think is John's right to be present and to hear this and to be able to say what his opinion is. That is the first issue.

The second issue—

THE COURT: But let me stop you there. But isn't the theory—and I don't know whether the theory is right or wrong. Maybe some appellate court will tell us whether it's right or wrong, but the whole concept of Christopher [C.] as it pertains to children—

[JOHN'S ATTORNEY]: Yes.

THE COURT:—is that even if they are consenting that they can be there as a second voice, so to speak—

[JOHN'S ATTORNEY]: Yes.

THE COURT:—to make sure that the department—if they're consenting to make sure the department does its job right presenting its case. We sort of buy that as being the- and obviously if you object then you're not on the department's team.

You're likely probably on the parents' team, or even in the strictest interpretation of Christopher [C.], in Christopher [C.] you've got two consenting parents then you've got the child there, the lone person in the wilderness sort of

being counterpoint to the slam dunk case of the department otherwise.

[JOHN'S ATTORNEY]: And from John's perspective, Your Honor, that is very true, and we were consenting to the extent that he could understand consenting. *I'm saying that the law should allow him also to be able to recognize his gradation of understanding that consent,* and at this time in 2000 John was 9—I'm sorry. He was 10. He's 11 now.

So we then have a child, and quite frankly just at the line of that kind of standing, *we're now at a place where a child was one year later and saying*—and it used to be that their levels of reason—people being able to understand and reason things, and I think that that one year was a good thing, but I also think that on the second issue of whether, in fact, a child for all intent and purposes understood his right to be present to discuss whether his parents would be—his parents' rights would be terminated and that everything was done properly.

\* \* \*

[COUNSEL FOR DSS]: ... I do wish again to speak to this issue of John B.

Your Honor, when [child's counsel] expressed to the court that she needed to separate the two children from her case, that was for purposes of conflict. That was a conflict that she had in her representation. That still did not create an objection where there had not been one before.

Your Honor, [child's counsel's] argument was entirely in the language of should. She said that the court should do this and should do that, but unfortunately, Your Honor, the Court of Appeals didn't speak in the language of should.

The court said the child is a party like the parent and should be treated the same way. That is the instruction from the Court of Appeals.

THE COURT: Not, should, shall.

[COUNSEL FOR DSS]: Shall. I'm sorry, Your Honor. That is the instruction from the Court of Appeals. It was clear language. There's no room—there's not room at this time for interpretation.

Now, perhaps again speaking in the language, in the subjunctive language there should be some interpretation and there should be flexibility given. *You know, children grow up. They change their minds. They have different understanding.*

*The department acknowledges that, but the Court of Appeals didn't acknowledge it, Your Honor, and it didn't seem to be an argument. It wasn't an argument that was foreseen by those parties that argued their cases. They wanted party status and they got it.*

[John's attorney] *did not object on behalf of her client, and therefore, despite what she said to the court, she has no right to stand here today and act as if she has a rash objection when, in fact, this court must treat her client's position as a consent.*

(Emphasis added).

Thereafter, the court said:

As to the legal discussion that did arise in closing argument, *the court certainly in considering all the factors and [the] proffer [of John's counsel] as to what John does or does not want, the court is really sort of torn.*

I don't think that specifically plays into, and certainly if I look at substantively John's position, the fact that he lives with his paternal grandparents, has contact with his mother and has other relationships, I'm not certain how that factors into the 2(iii) or (iv) factors, so I really don't—so even if I were to consider it I'm not sure where it clearly fits within the factors the court is to consider.

And if, on the other hand, though, I give it a strict Christopher [C.] interpretation I would then have to discount it completely if any evidence presented is inconsistent with John's consent. *So I think either way it really makes no difference, that if I do consider it I don't see where it*

*falls into a specific (c) or (d) factor, and if I didn't consider it giving it a strict Christopher [C.] consideration it goes out the window anyway, but it's anecdotal.*

But having considered all the factors this court is convinced by clear and convincing evidence that it is in the best interests of John . . . to grant the department's petition. . . .

(Emphasis added).

The foregoing makes clear to us that the court did not err or abuse its discretion in denying John's request to revoke his deemed consent. John was afforded a full opportunity to present his objection to the court; John's attorney elected to proceed by proffer, and was not limited in doing so. Moreover, no motion was made to strike the proffer. Clearly, then, the court was cognizant of John's position. Nevertheless, the court determined that John's view "makes no difference . . .," because application of the best interest standard warranted termination.

Even assuming that the court did not credit John's position, because of its uncertainty as to whether a child may withdraw a deemed consent, we remain satisfied that the court neither erred nor abused its discretion. We explain.

With respect to whether the statutory scheme permits a parent in a TPR case to revoke a deemed consent, *In Re Adoption/Guardianship No. 93321055/CAD,* 344 Md. 458, 687 A.2d 681 (1997), is instructive. There, the Court heard several consolidated cases and considered whether a parent who neglected to file a timely objection could, instead, file a belated objection, and whether a parent who consented based on a failure to file a timely objection could later revoke that "deemed consent." *Id.* at 465, 687 A.2d 681. As to the first question, the Court answered "ordinarily no." *Id.* at 466, 687 A.2d 681. As to the second, it said " 'no' with a caveat." *Id.* Writing for the Court, Judge Wilner stated, at 344 Md. at 481, 687 A.2d 681:

A deemed consent under [F.L.] § 5–322(d) may not be revoked [under F.L. § 5–317(3) ], for it is not a volitional consent but one arising by operation of law. If the parent

fails to file a timely objection, no further notices need be given to the parent, prior to or upon the entry of a judgment of guardianship. This conclusion is clear from both the structure and the history of the relevant statutes and rules.

In explicating its ruling, the Court reviewed the legislative history of F.L. §§ 5–317(e) and 5–322(d), stating:

From this legislative history, it is evident that, in enacting HB 590, the General Assembly intended to eliminate any uncertainty over the effect of a parent's failure, after proper notice, to file a timely objection. The sole purpose of regarding such a lapse as statutory consent imposed by operation of law and directing the court to proceed accordingly was to treat the case thereafter as though it were uncontested—to avoid the need for further notice and hearing and thus to speed up the judicial component of the permanency planning process.

That same purpose is equally clear in the 1992 and 1994 amendments to § 5–317(e). Until 1992, a parent who consented to a guardianship could revoke the consent at any time before judgment was entered. . . .

\* \* \*

At the urging of the Rules Committee, the General Assembly amended the statute in 1994 to fix the revocation period, in all cases, to 30 days after the consent was signed. 1994 Md. Laws, ch. 234. That change created a fixed, ascertainable expiration date—one that would allow DSS, the court, and all other interested parties to rely on the consent once the 30-day period expired.

In light of this history, *it is evident that any construction of § 5–317(e) or § 5–322(d) that would have the effect of engendering further delays or imposing additional impediments to achieving permanent and stable family settings for children placed in foster care, usually as a result of a CINA proceeding, would be flatly inconsistent with and*

*antithetical to the clear legislative purpose, and is to be avoided unless absolutely required.*

*Id.* at 483–84, 687 A.2d 681 (emphasis added).

Appellant seizes on the "absolutely required" language quoted immediately above. Unlike in this case, he argues that the untimely filings there were not based on developmental changes in the children that occurred with the undue passage of time.

To be sure, the Court in *In re Adoption No. 93321055* considered the effect of a deemed consent only with regard to a parent. Nonetheless, it recognized that a deemed consent arises by "operation of law." *Id.* at 481, 687 A.2d 681. In rejecting the parents' position advocating the right to revoke a deemed consent, the Court observed that the revocation period provided under F.L. § 5–317(e) is "clear, fixed, and easily ascertained." *Id.* at 485, 687 A.2d 681. Moreover, the Court said that the "certainty" obtained with strict adherence to the statute is "essential," so that DSS, the court, and the parties may know what right to notice and participation "the parent retains." *Id.*

Of significance here, the Court reasoned that if a parent is permitted to challenge a DSS petition at any time up to the entry of judgment, F.L. § 5–322(d) would be "essentially meaningless." *Id.* at 486, 687 A.2d 681. Further, the Court recognized that if a parent can revoke a deemed consent, this would "have the effect of giving a defaulting parent greater rights than one who affirmatively consents, and no rational justification" exists for that position. *Id.* Moreover, given the legislative objective of cutting off the right of a parent who fails to file a timely objection, the Court said: "We can find nothing in the Legislative history [of] § 5–322(d) . . . suggesting an intent to attach a right to revoke to the statutory consent." *Id.* The Court added that the necessary "certainty would not exist if a right to revoke is attached to the 'deemed' consent under § 5–322." *Id.* In its view, any other analysis would be tantamount to an unfettered right to revoke, which

the Legislature expressly rejected. Thus, the Court held, at 344 Md. at 486, 687 A.2d 681:

As a matter of statutory construction, therefore, we conclude that there is no right to revoke a statutory consent arising under § 5–322(d). That is a consent, as we have said, arising by operation of law, not by volition, and it is not within the power of the parent to revoke it.

Further, the Court concluded, at 344 Md. at 494, 687 A.2d 681:

[T]he statutory scheme of regarding the failure to file a timely objection as an irrevocable deemed consent to the petition does not facially offend any due process right of the parent.

In addition, the Court considered whether a trial court has authority to consider a belatedly filed objection. The parents argued that the trial court had such discretion and that the failure to afford such discretion would deny parents due process and equal protection. The Court rejected those arguments.

The Court reasoned that if a trial judge "had the general discretion to accept and consider a late-filed objection, no one could safely rely on the absence of a timely objection." *Id.* at 495, 687 A.2d 681. Moreover, in the context of a neglectful failure to object, the Court said: "[W]e believe that the risk of error in establishing an absolute deadline for filing a notice of objection is relatively small." *Id.* at 494, 687 A.2d 681. It added: "[I]n the normal case ... the parent is given fair and adequate notice of what is required and a fair and adequate opportunity to file a timely notice of objection." *Id.* Recognizing the interest in the "speedy resolution" of termination cases, *id.* at 495, 687 A.2d 681, the Court found no equal protection violation in regard to the refusal to accept a belatedly filed objection. It explained, at 344 Md. at 496, 687 A.2d 681:

[E]ven under a strict scrutiny analysis, we find no denial of equal protection of law in regarding the consent arising under § 5–322(d) as irrevocable and not allowing the court routinely to entertain late—filed objections.

As we indicated, the Court expressly addressed the issue of revocation of a "deemed consent" and belated objections in a TPR case only with regard to the parent, not the child. Although there are important considerations that distinguish a parent from a child in the context of a TPR case, the Court surely was aware that a parent may also be a minor. If, as John urges, the child in a termination case ought to be treated more leniently than a parent for purposes of revocation of a deemed consent or the filing of a belated objection, it would seem that the same rationale would apply when the parent in a TPR case happens to be a minor. Yet, the Court did not carve out an exception in those cases in which the parent in a TPR case also holds the status of a minor.

On the other hand, the Court did recognize that a due process issue "might indeed" arise if a parent is precluded from withdrawing a deemed consent that resulted from certain circumstances beyond the parent's control, such as when a parent was unable to timely respond because he or she was in a coma. *Id.* at 493, 687 A.2d 681. In our view, the circumstances presented by John to justify his revocation of consent are not comparable to the kind of dire circumstances identified by Judge Wilner.

When we couple the Court's opinion in *In Re Adoption/Guardianship No. 93321055,* 344 Md. 458, 687 A.2d 681, with its decision in *In Re Adoption/Guardianship No. T97036005,* 358 Md. 1, 746 A.2d 379 (2000), we are all the more convinced that no error or abuse of discretion occurred here. *In re Adoption No. T97036005* involved children in several TPR cases who complained on appeal that the trial court had wrongfully denied them party status. Although the parents had affirmatively consented to termination or were statutorily deemed to have consented, the children had objections that the trial court did not consider. The Court of Appeals agreed with the children that they were, indeed, parties, with a corresponding right to participate and to be heard.

One of the children was nine-year-old Christopher C., whose parents had consented to termination. Nevertheless, the

child's lawyer sought a postponement of the trial to ascertain Christopher's view. Because the attorney was concerned that termination was "therapeutically contraindicated," *id.* at 10, 746 A.2d 379, she wanted to investigate further. Although the child's lawyer argued that Christopher was a party to the proceedings, with a right to present evidence, the trial court disagreed and granted the termination petition.

Writing for the Court, Judge Raker "agree[d] with the children that ... they have a right to a hearing on the merits," and the denial of a hearing on the merits violated their statutory rights. *Id.* at 13, 746 A.2d 379. In reaching that decision, the Court relied on Md.Code (1998), Courts and Judicial Proceedings Article ("C.J."), § 3–801(n), which defines "party" to include "a child who is the subject of a petition," and C.J. § 3–804(a), which establishes that a "child who is the subject of a petition includes a child in a termination of parental rights proceeding." *Id.* at 14, 746 A.2d 379. The Court said:

> We hold that in creating the statutory scheme governing the status of a child in a termination of parental rights action following a CINA action, the Legislature intended to make the child a party to the proceeding.

*Id.* at 15, 746 A.2d 379.[5] The Court added:

> We hold that when the child *timely* requests a hearing and opposes the petition, the trial judge does not have discretion to deny the child's request for hearing.

\* \* \*

The best interest of the child must be determined only after the court considers the required [statutory] factors ...

---

**5.** In view of the Court's decision, which was based on the statute, the Court declined to resolve the question of whether the children's rights were constitutional in nature. *Id.* at 15–16, 642 A.2d 201. Although the Court did not reach the constitutional issue, it recognized, as we noted earlier, that a child "ordinarily has an interest in maintaining a close familial relationship with siblings" and other family members. 358 Md. at 16, 746 A.2d 379.

whenever [the court] conducts a hearing in a guardianship action.

*Id.* at 22–23, 746 A.2d 379 (Emphasis added).

Clearly, the Court recognized that a child in a TPR case is entitled to the same rights and protections as a parent. It would seem, then, that as a party, the child is also bound by the same obligations generally imposed by statute or rule upon other parties. As we observed, F.L. § 5–322(d) and Rule 9–107 both apply to any "person;" neither the statute nor the rule makes any distinction between children and other persons. In other words, the provisions do not carve out an exception when the person happens to be a child.[6] It follows that the rationale of the Court in *In re Adoption/Guardianship No. 93321055*, 344 Md. 458, 687 A.2d 681, which expressly barred a parent's revocation of deemed consent or the filing of a belated objection, applies with equal force to the child in a TPR case.

█ We recognize that there may be extreme circumstances that justify providing the child in a TPR case with an opportunity to revoke a statutory consent. But maturation,

---

**6.** Both F.L. § 5–322(d) and Rule 9–107(b) use the term "shall." For example, F.L. § 5–322(d) provides that the court *"shall* consider" the failure to object as a consent. The term "shall" generally "indicates a mandatory intent, unless the context of the statute indicates otherwise." *Burch v. State*, 358 Md. 278, 284, 747 A.2d 1209 (2000); *see In Re Anthony R.*, 362 Md. 51, 60, 763 A.2d 136 (2000); *see Branch v. McGeeney*, 123 Md.App. 330, 356, 718 A.2d 631 (1998); *Witt v. Ristaino*, 118 Md.App. 155, 172, 701 A.2d 1227 (1997). But, the term "shall" does not always have a mandatory meaning. *See In Re Abiagail C.*, 138 Md.App. 570, 581, 772 A.2d 1277 (2001). ("Depending on the context, placement, and use of the word 'shall,' and the nature of the constitutional provision or statute in which it appears, the word may have a mandatory connotation, so as to require that the action that 'shall' be done must be done, or may be directory in meaning, so as to exhort the doing of the thing that 'shall' be done without requiring it."). For cases in which the term "shall" was not considered mandatory by the Court of Appeals, *see, e.g., McCalls Ferry Power Co. v. Price*, 108 Md. 96, 112–14, 69 A. 832 (1908)(holding that Article IV, § 15 of the Maryland Constitution, stating that Court of Appeals "shall file" its opinion in a case within three months of argument or submission, is directory, not mandatory); *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987); *In re Dewayne H.*, 290 Md. 401, 430 A.2d 76 (1981).

which is foreseeable and generally inevitable, does not seem comparable to the example utilized by Judge Wilner to illustrate a possible due process concern. Moreover, although there may be compelling reasons to distinguish a child from a parent in a TPR case, whether such distinctions necessarily warrant the relief that John requested is a matter for the General Assembly or the Court of Appeals to address.

■ To the extent that the court below failed to permit John to withdraw his deemed consent, we conclude that the court neither erred nor abused its discretion. We hasten to add, however, that our conclusion does not alter the paramount principle in cases of this kind; even if the child is deemed to have consented, and cannot withdraw that consent, the court may not grant a TPR petition unless it is satisfied, by clear and convincing evidence, that such a ruling is in the child's best interest.

## C.

■ We next consider whether the court adequately considered John's family ties, and whether the evidence was legally sufficient to justify termination of parental rights.

The court first addressed F.L. § 5–313(c)(1), which requires it to consider "the safety and health of the child." The court found that the Department met John's safety and health needs, but the mother did not do so.

Under F.L. § 5–313(c)(2)(i), the court must consider "the timeliness, nature and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent." DSS proffered that it had offered Ms. H. the services she needed: drug treatment, parenting training, and housing assistance. The court below found that the Department offered Ms. H. timely and appropriate services, including furniture, drug treatment, and other referrals. That finding is not demeaned because, alternatively, the court waived DSS's obligation to provide further services. In any event, John does not dispute DSS's proffer, nor does he

suggest any other services that Ms. H. should have been provided.

Under F.L. § 5–313(c)(2)(ii), the court is required to consider "any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement." The court observed that Ms. H. entered several service agreements and safety plans between August 4, 1995, and November 22, 1999. Each agreement required Ms. H. to complete drug treatment, maintain stable housing, and complete parenting classes. The court was satisfied that the Department made the necessary referrals, but Ms. H. failed to fulfill her obligations. John concedes in his brief that his mother did not fulfill any service agreements. Nor does he dispute the proffer.

With respect to the factors under F.L. § 5–313(c), John seems to focus on the trial court's findings under F.L. § 5–313(c)(2)(iii), which required the court to consider "the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest." John contends that the court ignored important evidence regarding his feelings for his mother and half siblings. To the contrary, as we noted, the court considered the proffers of all the parties.

The evidence and proffers demonstrated that John feels affection for his mother. But, the proffers also showed Ms. H.'s failure over the course of several years to take the necessary steps to overcome the drug abuse that led her to neglect John in the first place. Moreover, DSS's counsel proffered that Ms. H. did not visit John regularly, and Ms. H.'s own lawyer acknowledged that she "has not been around." John's counsel did not dispute those proffers.

Further, the court found that "there is a relationship between John and his mother ... but that's not a parental bond." Instead, the court found a parental bond between John and his paternal grandparents, who have been his caretakers since 1995. Although John quarrels with that conclu-

sion, the record supports the court's finding that the grand-parents have functioned as John's parents since 1995.

Relying on *In re Tamara R.*, 136 Md.App. at 243, 764 A.2d 844 (2000), John emphasizes the importance that both federal and state courts have placed on sibling relationships. Indeed, we have said that "the sibling relationship has been widely recognized as an important one, which will be given significant consideration and protection by courts in cases involving the family." *Id.* at 259, 764 A.2d 844. DSS maintained, however, that there was no evidence that termination would mean that John would be denied a relationship with his half-siblings. As we noted, the Department did not pursue termination as to James, who is now almost eighteen. Moreover, Shunta wanted to be adopted by her foster family.

John's emotional ties toward his mother and his siblings are, of course, important factors for the court to consider. F.L. § 5–313(c)(2)(iii). But, no one factor is controlling. Rather, the court must "review all of the relevant factors and consider them together." *In re Adoption/Guardianship No. 94339058*, 120 Md.App. at 105, 706 A.2d 144.

Under F.L. § 513(c)(2)(v)(1), the court must consider "the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent." The court did not err in finding that Ms. H. has not maintained regular contact with John.

As to the "d" factors, John asserts that no findings were made that were relevant to him. Therefore, he asserts that the court had no basis to waive the Department's obligations.

F.L. § 513(d)(1)(i) requires the court to evaluate whether "the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time." The court stated that no evidence existed of any disability as to the mother.

Pursuant to F.L. § 513(d)(1)(ii), the court must address whether "the natural parent has committed acts of abuse or neglect toward any child in the family." The court stated:

> [T]here is evidence that Shunta was born in 1993 and mother tested positive for drugs. The court does find this to be acts of abuse and neglect, so the court is making that finding as to mother.

John asserts that the court improperly found that this was an aggravating factor as to him. DSS counters that John's claim is "off the mark." It notes that F.L. § 5–313(d)(1)(ii) requires the court to consider actions by the parent toward "*any*" child in the family."

In our view, the trial court did not err when it found that the serious risk of harm to which Shunta had been exposed during Ms. H.'s pregnancy was an aggravating factor. As DSS correctly observes, "[t]he parents' ability to care for the needs of one child is probative of their ability to care for other children in the family." *In re William B.*, 73 Md.App. 68, 77, 533 A.2d 16 (1987), *cert. denied*, 311 Md. 719, 537 A.2d 272 (1988). Moreover, "it has been long since settled that a parent's past conduct is relevant to a consideration of his or her future conduct." *In re Dustin T.*, 93 Md.App. 726, 731, 614 A.2d 999 (1992), *cert. denied*, 329 Md. 480, 620 A.2d 350 (1993). The undisputed proffer of DSS established that Ms. H.'s drug problem led to the children's removal, nor did she take steps to ensure that her drug dependency would not endanger the health and safety of her children.

F.L. § 513(d)(1)(iii) requires the court to determine whether "the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able." The court found no evidence that Ms. H. repeatedly failed to give the children adequate food, clothing, and shelter, when she had the ability to do so.

Under F.L. § 513(d)(1)(iv), the court must determine whether "the child was born: (A) addicted to or dependent on

cocaine, heroine, or a derivative thereof; . . ." The court noted that "there's no evidence that John was born drug exposed. There is some evidence suggesting that Shunta was. However, this was prior to this legislation of the statute being amended, so the court is not applying that factor."

Pursuant to F.L. § 513(d)(1)(v), the court must consider whether "the natural parent has: 1. subjected the child to: A. torture, chronic abuse, or sexual abuse; or B. chronic and life-threatening neglect; . . ." The court found no evidence of such abuse or neglect.

Finally, F.L. § 513(d)(3) requires the court to "consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations . . . if the court, after appropriate evaluation of all efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child." The court below stated:

> [T]he court is convinced by clear and convincing evidence that it is in . . . John's best interests to waive the department's obligations to mother under [the] subsection because of the specific (D)(1)(ii) finding that the court made as to Shunta being born while mother had a positive toxicology, so I'm waiving as to mother.

*In re Adoption/Guardianship No. 10941,* 335 Md. at 120, 642 A.2d 201, is instructive. There, the Court considered "whether the trial court erred as a matter of law in denying the Department's petition for guardianship based on its finding that the termination of parental rights was not necessary to achieve permanency with custodial grandparents." *Id.* The Court of Appeals held that the court's finding that termination of parental rights was unnecessary for the child to remain in the custody of the grandparents did not justify a denial of the petition. *Id.* It said, at 335 Md. at 120, 642 A.2d 201:

> Nowhere does F.L. Title 5 list necessity of terminating parental rights as a factor in determining whether it is in the child's best interests to terminate a natural parent's

rights to the child. Only termination of parental rights and a subsequent permanent placement, such as the adoption sought by the grandparents here, can provide [the child] with the permanency he needs and the Legislature has mandated. [The child's] continuation in foster care lacks the permanent legal status required by state law. He remains within the foster care system and thereby subject to administrative review every six months. He also remains under the jurisdiction of the juvenile court, subject to periodic judicial review. This constant administrative and judicial supervision is disruptive to the lives of [the child] and his grandparents, and is the type of uncertainty the child welfare statutes were designed to avoid.... More importantly, while the grandparents have expressed their unequivocal desire to adopt [the child], if they are not his legal parents, they can later decide for whatever reasons, that they are no longer in a position to care for [the child]. If this were to occur, the grandparents would simply inform the juvenile court that retains jurisdiction over [the child] that they can no longer care for him and the court would have no alternative but to place him back in the foster care system. This possible "foster care drift" is exactly what Congress and our General Assembly desire to avoid.

Appellant argues that DSS's reliance on *In re Adoption/Guardianship No. 10941* is misplaced, because "there is no assurance on this record that John's grandparents can or will adopt him." John is also concerned that an outside adoption would risk severance of his relationship with his grandparents, and prevent him from maintaining a relationship with his siblings. Thus, he contends that this case "is critically different" from the situation presented in *In re Adoption/Guardianship No. 10941*. Further, John argues:

[T]ermination creates uncertainty for the child and may well work against permanency. Once the parental tie is severed, the child is a candidate for adoption. If the grandparents do not or cannot adopt the child—and there is no indication on this record that the grandparents can or are willing to adopt John—the child remains a ward of the State and may

be removed from their care to encourage the child to bond with another adoptive resource. While such decision by the Department might be ill-advised, it could withstand scrutiny under a more deferential standard of review than the clear and convincing standard applicable to termination proceedings.

Certainly, there is no guaranty that John will remain with his grandparents, but life has no guaranties. Significantly, even if a problem arises with John's grandparents, John cannot be adopted by anyone without his consent. *See* F.L. § 5–311(a)(3) (stating that a child who has reached the age of ten may not be adopted unless he or she consents). Therefore, John's concerns about the loss of contact with his biological family are completely speculative.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**